**In re EVANSTON BEAUTY SUPPLY, INC., Debtor.**

**Bankruptcy No. 91 B 08028.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Jan. 30, 1992.

Glenn Heyman, Dannen, Crane, Heyman & Simon, Chicago, for debtor Evanston Beauty Supply, Inc.

Faye B. Feinstein, Altheimer & Gray, Chicago, for LaSalle Nat. Bank.

M. Scott Michel, Chicago, Ill., U.S. Trustee.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes to be heard on the motion[1] of Eldon Ham, of Zucker & Ham, Ltd., (the "Applicant") pursuant to 11 U.S.C. § 506(c) for allowance and approval of attorneys' fees in the sum of $16,762.00, for services rendered for the period of February 8, 1991 through April 26, 1991. Objections thereto were filed by LaSalle National Bank (f/k/a Exchange National Bank of Chicago), (the "Bank"). For the reasons set forth herein, the Court sustains the Bank's objections and denies the requested fees.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this fee application pursuant to 28 U.S.C. § 1334 and General Rule 2.33(a) of the

---

1. Requests for attorneys' fees should be brought before the Court on application rather than motion. *See* Fed.R.Bankr.P. 2016.

United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (*O*).

## II. FACTS AND BACKGROUND

On April 15, 1991, three creditors of Evanston Beauty Supply, Inc. (the "Debtor") filed an involuntary bankruptcy petition seeking an order for relief under Chapter 7. The alleged Debtor, then represented by the Applicant, exercised its rights and moved under 11 U.S.C. § 706(a) to convert the case to a Chapter 11 reorganization on April 22, 1991. At that time, however, the Applicant did not apply to be retained as attorney for the Debtor. That motion noted the existence of a pending foreclosure action and sale proposed by the Bank, which was stayed by the filing of the involuntary petition. The motion also alleged the undisputed fact that a third party had offered to purchase most of the Debtor's assets at full book value. Accordingly, the Debtor desired to convert to Chapter 11 in order to pursue an orderly asset sale to preserve the value of the Debtor's accounts receivable, inventory, and other collateral in which the Bank had an undisputed perfected pre-petition security interest.

Subsequently, on April 23, 1991, for cause, the parties moved for entry of an interim financing order (the "Interim Order"). It is undisputed that the Bank was the lender holding valid and senior pre-petition liens on most of the Debtor's assets. It sought the benefits of the super-priority afforded under 11 U.S.C. § 364(c)(1) for its post-petition financing of the ongoing operations of the Debtor, pending the proposed sale. The Interim Order excluded from the post-petition collateral base subject to the Bank's replacement liens, the bankruptcy causes of action potentially available to the Debtor under 11 U.S.C. §§ 544, 547, 548, 549 and 550. The Interim Order specifically "carved out" an allowance for a potentially allowable administrative expense under 11 U.S.C. §§ 503(b) or 507(b) for $5,000.00 of attorneys' fees for counsel of any unsecured creditors' committee appointed in the case. Significantly, the Interim Order was expressly agreed to by the Applicant and the principal and president of the Debtor, Mr. Louis Orenstein, who was a guarantor of the Bank's debt. The Court ordered requisite notice of the entry of the Interim Order to be sent to the appropriate parties under Federal Rule of Bankruptcy Procedure 4001, and set the final hearing for May 2, 1991.

Thereafter, on May 2, 1991, Glenn Heyman ("Heyman"), of the law firm Dannen, Crane, Heyman & Simon, moved for retention as counsel for the reorganizing Debtor pursuant to 11 U.S.C. § 327 and supported the application with the requisite affidavit under Bankruptcy Rule 2014. That application was approved and an order of retention entered. At the same time, a separate order was entered giving Heyman leave to substitute as counsel for the Debtor, in lieu of the Applicant, who withdrew as attorney of record. The order was expressly consented to in writing by Orenstein and the Applicant. Subsequently, the final financing order (the "Final Order") was entered. The Final Order was identical to the Interim Order, except that it contained an express provision for an additional "carveout" for reasonable attorneys' fees for Debtor's counsel, not to exceed $20,000.00. Otherwise, the Final Order provided that the Bank's super-priority afforded under section 364(c)(1) was prior to all other allowed administrative expenses, save the "carveouts" in favor of counsel for the unsecured creditors' committee and counsel for the Debtor. No appeals were taken from the entry of either the Interim or Final Orders.

On July 11, 1991, the Applicant filed an application for award of attorneys' fees pursuant to 11 U.S.C. § 330 for the total of $16,762.00; $11,730.00 allocable to work performed pre-petition and $5,032.00 for services performed post-petition. The application requested approval of the retention of the Applicant on a *nunc pro tunc* (sic) or retroactive basis for the period of April 15 through April 26, 1991. According to that application, similar to the instant application, the Applicant participated in the negotiations of the proposed sale of

most of the Debtor's assets to the third-party purchaser. In conjunction therewith, the Applicant provided some counsel and assistance to Orenstein, who during the course of the subsequent sale proceedings, transferred his employment from the Debtor to the purchaser.

Objections to the first application were lodged by the Official Committee of Unsecured Creditors (the "Committee"). It contended that the Applicant's pre-petition services were not properly compensable as an administrative claim. Rather, those services were only entitled to treatment as an unsecured pre-petition claim. The Committee noted that there had been no retention order obtained by the Applicant under section 327, and the application was not accompanied with the requisite Bankruptcy Rule 2014 affidavit. Moreover, the Committee objected to the allowance of any fees because of the possible duplication of services rendered by the Applicant and the Debtor's authorized attorney, Heyman. The Committee's objections were sustained and the application denied without prejudice on August 29, 1991. The Court noted that the Applicant had a conflict of interest in concurrently representing Orenstein and the Debtor. The Applicant was given leave to seek compensation under section 506, at the suggestion of the Committee. The Applicant's motion to reconsider this ruling was denied on September 12, 1992.

Thereafter, the Debtor filed a liquidating plan and disclosure statement on September 17, 1991, and such liquidation proceeded. Heyman applied for allowance of attorneys' fees and costs on October 21, 1991. No objection thereto was made and same were allowed on November 18, 1991, in an amount which exceeded the "carve-out" under the Final Order. The instant application was filed on December 3, 1991, requesting the same fees be charged against the Bank under section 506(c) to which the Bank has objected.

## III. ARGUMENTS OF THE PARTIES

The Applicant contends the services provided preserved the value of the assets and enhanced the Bank's recovery on same, thus facilitating a reasonable and expeditious disposition through the subsequently approved sale. The Applicant further argues that the Bank received a direct benefit because, with the knowledge and cooperation of the Bank, the Debtor sold the subject assets to a third party at full book value. The Applicant submits that the expenditure of one hundred hours at $170.00 per hour was necessary and reasonable. Moreover, the Bank, by not objecting to the prior fee application has effectively impliedly consented to payment for the services performed. The legal services rendered included some due diligence investigation and inspection of the prospective buyer and its operations, as well as substantial involvement in the negotiation and drafting of the principal sale documents. Furthermore, the Applicant urges that if the prior application had been allowed, the net effect on the Bank would have been the same as the allowance of the subject fees taxed against the Bank under section 506(c). Ultimately, the allowed fees would be paid out of the sale proceeds of the liquidated collateral base to which the Bank's liens attach, so either way, the Bank's position would not be exacerbated. The Applicant concludes that it would be inherently unfair and unequitable for all interested parties to benefit from the Applicant's efforts, most especially the Bank, which otherwise would have to pay its own separate counsel fees to do legal work which the Applicant rendered.

The Bank objects to allowance of the fees requested on several grounds. The Bank notes that the Debtor owed it approximately $6,000,000.00 at the time of the petition. After the sale of the subject assets, the remaining debt after application of the sale proceeds, remains between $1,850,000–$2,000,000. The Bank principally contends that the Interim and Final Orders gave the Bank a super-priority under section 364(c)(1) over all allowable administrative expenses with the exception of the two negotiated "carveouts". Both "carveouts" have already been effectively exhausted. Thus, there is no remaining "carveout" available for the Applicant's requested fees, even if same were properly

allowable under section 506(c). Next, the Bank contends that many of the services performed by the Applicant did not preserve the subject assets or directly benefit the Bank. To the contrary, the Bank contends that many of same benefitted Orenstein, as guarantor of the Bank debt to whom the Applicant should send his bill. Moreover, most of the services in question were rendered pre-petition to the extent of approximately $11,645.00. Therefore, same should only be allowable as a general unsecured claim, and the Court has no jurisdiction to review or award fees against the Bank under section 506(c) for such pre-petition services. Furthermore, the Bank contends that the services performed in the post-petition gap period between the date of the involuntary petition filed and the subsequent date when the Debtor consented to an order for relief and converted the case to Chapter 11, would be allowable in the approximate amount of $3,264.00. Under the Orders, however, that amount could not "prime" the Bank's super-priority. The Bank contends that its position is substantially under-secured and the potential bankruptcy causes of action to which its liens did not attach are estimated to range between $300,000.00–$400,000.00. Therefore, such proceeds, as actually recovered by the Debtor or a successor trustee, are for the benefit of the Bank, along with other unsecured pre-petition creditors. Same would be subject to further depletion in favor of future, allowable administrative fees needed to collect and reduce same to cash for the estate. It would be inherently unfair to use that potential fund to satisfy the Applicant's fee request. The Bank contends most strongly that unless the Applicant's services are shown to have enhanced the amount received by it through the sale of the subject assets, the Bank should not bear any section 506(c) surcharge. The Bank concludes it received the same net dollars from the sale that it would have received if no bankruptcy had been filed.

## IV. DISCUSSION

### 11 U.S.C. § 506(c) FEES AND COSTS

■ Traditionally, the estate and not the secured creditors bears the costs of the administrative expenses of the estate. *In re Trim–X, Inc.,* 695 F.2d 296, 299 (7th Cir.1982). The basic premise underlying that general rule was stated in *Trim–X:*

> The reason for that rule is that a trustee in bankruptcy acts 'not on the authority of [secured creditors] and for their interest, but on the authority of the court and for the interest of the general creditors.' *Robinson v. Dickey,* 36 F.2d [147] at 149 [3rd Cir.1929]. An exception to that general rule has been recognized, however, when expenses of preservation are incurred primarily for the benefit of the secured creditor....

*Id.* at 301.

■ The exception to this general rule is contained in Section 506(c) of the Bankruptcy Code and provides as follows:

> (c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c).

The underlying premise of section 506(c) is that the unsecured creditors should not be required to bear the cost of protecting the secured creditors' collateral. *In re Codesco, Inc.,* 18 B.R. 225, 230 (Bankr.S.D.N.Y. 1982). The statute's language limits standing to the trustee. Case law in this district has extended the benefit of section 506(c) to debtors-in-possession. *See In re Energy Cooperative, Inc.,* 55 B.R. 957 (Bankr. N.D.Ill.1985); *In re Reda, Inc.,* 54 B.R. 871 (Bankr.N.D.Ill.1985). Other cases in this district have given standing under section 506(c) to attorneys for debtors-in-possession. *See In re Chicago Lutheran Hosp. Asso.,* 89 B.R. 719, 726 n. 9 (Bankr.N.D.Ill. 1988). Judge Ginsberg opined in *Chicago Lutheran* in *dicta* that other professionals should have standing to seek the benefit of section 506(c) if the secured creditor benefits because it should pay for such benefits it receives and not reap a windfall. The Court joins that view. Standing to invoke the benefit of section 506(c) is not solely limited to trustees. *See In re Palomar*

*Truck Corp.*, 951 F.2d 229 (9th Cir.1991); *contra In re Great Northern Forest Products, Inc.*, 135 B.R. 46 (Bankr.W.D.Mich. 1991). Thus, the Applicant has standing to apply for the fees sought.

 In order for the Bank to be charged with costs and expenses under section 506(c), the Applicant must prove three elements: 1) the costs and expenses must be reasonable; 2) the costs and expenses must be necessary in preserving or disposing of the collateral; and 3) the Bank must benefit from such costs and expenses. *Trim–X*, 695 F.2d at 299; *In re Kotter*, 59 B.R. 266, 269 (Bankr.C.D.Ill.1986); *In re Worrell*, 59 B.R. 172, 175 (Bankr.C.D.Ill. 1986); *In re Loop Hospital Partnership*, 50 B.R. 565, 571 (Bankr.N.D.Ill.1985). A determination of whether the costs and expenses meet the requirements of section 506(c) depends upon the facts of each case. *Chicago Lutheran*, 89 B.R. at 727. The most important element as well as the most difficult to prove is that the secured creditor received a benefit. *In re AFCO Enterprises, Inc.*, 35 B.R. 512, 515 (Bankr. D.Utah 1983). Proof of direct benefit is required. *In re Flagstaff Foodservice Corp.*, 739 F.2d 73 (2d Cir.1984); *In re Pullman Constr. Industries, Inc.*, 107 B.R. 909, 941 (Bankr.N.D.Ill.1989). The party seeking to recover administrative costs and expenses must show that the secured creditor received a quantifiable (not qualitative or generalized) benefit. *Dozoryst v. First Financial Sav. & Loan Asso.*, 21 B.R. 392, 394 (N.D.Ill.1982).

 First, the element of whether the costs and fees are reasonable is frequently viewed as a comparison of the costs and fees sought with those that the secured creditor would have incurred in foreclosing on the property on its own behalf. *Kotter*, 59 B.R. at 269; *In re Combined Crofts Corp.*, 54 B.R. 294, 297 (Bankr.W.D.Wis. 1985); *Codesco*, 18 B.R. at 228. After a review of the application and supporting time summaries, the Court finds the services were reasonable. The Applicant's services were billed at $170.00 per hour, a rate well within the current range of attorneys' rates in the Chicago metropolitan area. Al-

though the time summaries contain numerous telephone calls and correspondence with Orenstein and others, many of the entries also show calls, correspondence and negotiations with the Bank's counsel, the purchaser and others, including Heyman. No one, including the Bank, has objected to the reasonableness of the Applicant's services so this element of section 506(c) has been met.

The next element is whether the services were necessary. The Seventh Circuit takes a very narrow approach to what is a necessary expense under section 506(c). *Trim–X*, 695 F.2d at 299–300. The Applicant contends that because no specific objection was raised to the necessity of the services expended, the Bank has effectively conceded this point. The Court, however, disagrees. Just because all of same were actually and reasonably rendered does not, *ipso facto*, make same necessarily expended for the direct benefit of the Bank.

It is patently obvious from the time summaries that the Applicant's correspondence and telephone calls with the Bank's attorneys and its other representatives regarding the negotiations leading to the sale provided a direct quantifiable benefit to the Bank, and were probably necessary in protecting the Bank's interest in the subject collateral. It is not so clear, however, that the Applicant's other telephone calls and correspondence with Orenstein were necessary to directly benefit the Bank. Rather, it is more logical to infer that they directly benefitted Orenstein who had guaranteed the Bank's debt, and who was personally represented by the Applicant and also benefitted from some of the services incidental to the sale. The Court can reasonably conclude that Orenstein directly benefitted from his correspondence and communication with the Applicant, and that the Bank only indirectly or secondarily benefitted from the Applicant's services. Accordingly, the Court concludes that some, but not all, of the services performed may have been necessary to protect the Bank's interest in the subject collateral. Nevertheless, the extent and exact amount thereof is not clear from the application. Consequently,

the second element for recovery under section 506(c) has not been shown by a preponderance of the documentary evidence.

The key element for recovery under section 506(c) is whether the services conferred a direct benefit on the Bank. The secured creditor cannot be required to bear expenses which benefit the estate under the theory that the expenses were incurred to preserve the assets of the estate as a whole. *Chicago Lutheran*, 89 B.R. at 728. Section 506(c) does not convert ordinary administrative expenses to preservation costs through a broad definition of benefit. *In re C.I.T. Corp. v. A & A Printing, Inc.*, 70 B.R. 878, 881 (Bankr.M.D.N.C. 1987). The Applicant has not shown that the continued operation in Chapter 11 and the resultant sale produced any higher or enhanced realized value to the Bank of the liquidated assets, or conversely that the Applicant's services in any way diminished any loss of realized asset value to the Bank. Although part of the Applicant's work undoubtedly conferred a qualitative and general benefit to the Bank, the requisite showing of a precise quantitative benefit has not been proved. *Dozoryst*, 21 B.R. at 394.

There is an exception to the third element of direct benefit when the secured creditor has expressly or impliedly consented to allowing compensation to be paid out of its collateral. *Chicago Lutheran*, 89 B.R. at 730–731. "Mere cooperation with a debtor or acquiescence in an attempted reorganization is insufficient.". *Id.* at 730. Implied consent is rare in the absence of express consent because a secured creditor's cooperation in reorganization or sales efforts is not the equivalent of consent to finance the costs of a reorganization case. That burden has not been met here. There is no express or implied consent by the Bank to the Applicant's request for fees. This conclusion results because of the written stipulation which the Applicant signed, agreeing to the terms and conditions of the Interim Order. By same, the Applicant and others expressly agreed to afford the Bank a super-priority for the Bank's post-petition financing with a priori-

ty over all allowable administrative expenses, save the $5,000.00 "carveout" for counsel fees for the Committee. Although the Applicant did not formally stipulate to the Final Order, it incorporated by reference the identical terms and conditions of the Interim Order, except for the additional "carveout" of $20,000.00 for counsel for the Debtor. Heyman has already received and exhausted that amount. The facially appealing equitable arguments raised by the Applicant do not override or negate the Applicant's express agreement to the Bank's super-priority.

Negotiated "carveouts" have been the subject of various decisions and are viewed as being necessary in order to preserve the balance of the adversary system in reorganization. "Carveouts" for fees from super-priority post-petition liens are designed to provide for payment of fees of the debtors and unsecured committee's counsel, trustee's counsel and other professional persons. "Carveouts" are used in order to avoid skewing the necessary balance of debtor and creditor protection needed to foster the reorganization process. Same is designed to accommodate all classes of creditors and equity interests, rather than one especially crafted for the benefit of the pre-petition lender having a perfected lien on all cash collateral, or the principal of the debtor who guaranteed that debtor's debt. *See In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 38 (Bankr.S.D.N.Y.1990). *Ames* noted that post-petition financing should not be approved where it is apparent that the only purpose is to benefit a single creditor, rather than the estate as a whole.

The stipulation made by the Applicant in the Interim Order is in the nature of a settlement agreement, resolving the tension between sections 364(c)(1) and 506(c). In this district, as a general proposition, voluntary resolution of litigation through settlement is favored by the courts. *Victory Beauty Supply Co. v. Lus–Ter–Oil Beauty Products Co.*, 562 F.Supp. 786, 789 (N.D.Ill.1983). A settlement agreement is a contract, *Reichelt v. Urban Invest. & Dev. Co.*, 611 F.Supp. 952 (N.D.Ill.1985) which cannot be unilaterally

repudiated by any of the parties. *Debose v. Mueller*, 552 F.Supp. 307, 308 (N.D.Ill. 1982).

The terms of the stipulation to which the Applicant agreed in the Interim Order are not ambiguous. The Court need not look further than the language of the Interim Order because the primary objective in construing same is to give effect to the intent of the parties who stipulated to it. This Court retains the inherent power to enforce such a settlement agreement reached in this case, especially where it is an express written stipulation rather than an oral agreement. *See Herron v. Chicago*, 618 F.Supp. 1405 (N.D.Ill.1985). Although *Herron* and the other referenced cases did not involve bankruptcy issues, such principles are equally applicable in the context of this bankruptcy reorganization. In short, the Court expects negotiated post-petition agreements to be adhered to, especially stipulations entered into by officers of the Court. Enforcement of such orders of the Court is important for the continued efficiency and integrity of the bankruptcy reorganization process. To allow this application and require payment of the requested fees directly from the Bank, over its objection, notwithstanding the terms of the Interim and Final Orders, would eviscerate the effect of the negotiations and the enforcement of those Orders.

The Court is sympathetic to the Applicant's plight. The denial of this application is in no way a negative inference on the Applicant's efforts and abilities. Although this case appears to have been one of the Applicant's initial forays into the risky quagmire of Chapter 11 reorganizations, and the substantive requirements for properly allowable compensation from the estate under sections 327 and 330, or from a secured creditor under section 506(c), the Applicant is not without potential recourse for payment of these disallowed fees. Orenstein was a principal beneficiary of many of the services rendered by the Applicant. After all, Orenstein's transfer of employment from a principal of the Debtor to an employee of the third-party purchaser was a condition precedent and an essential element of the negotiated sale terms. No additional "carveout" was negotiated for the Applicant, but same was not precluded, and could have been provided for had the parties so agreed. Although the estate is not liable for these legal services because of the Applicant's lack of retention and conflict of interest in representing Orenstein, and the Bank is not liable under section 506(c) for the foregoing reasons, the Applicant may have a proper basis to seek compensation from Orenstein on at least a *quantum meruit* basis. Although the result here at first blush may seem harsh, it is mandated by the applicable controlling case and statutory authorities, as well as the history of the case.

## V. CONCLUSION

For the foregoing reasons, the Court denies the Applicant's request for compensation under section 506(c) and sustains the objections thereto filed by the Bank.

This Opinion is to serve as findings of fact and conclusions of law pursuant to Federal Rule of the Bankruptcy Procedure 7052.