**In re LAFAYETTE HOTEL PARTNERSHIP, Debtor.**

**WHBA REAL ESTATE LIMITED PARTNERSHIP, Appellant,**

v.

**LAFAYETTE HOTEL PARTNERSHIP, Debtor–Appellee.**

Nos. 96 CIV. 7476(HB), 95 B 40682 (BRL).

United States District Court, S.D. New York.

Nov. 23, 1998.

Harvey A. Strickon, Paul, Hastings, Janofsky & Walker, LLP, New York City, for WHBA Real Estate Limited Partnership, appellant.

---

## *OPINION AND ORDER*

BAER, District Judge.[1]

Appellant WHBA Real Estate Limited Partnership ("WHBA") appeals from a Bankruptcy Court Order ("Confirmation Order"), Lifland, B.J., confirming Debtor–Appellee Lafayette Hotel Partnership's ("Debtor's") Chapter 11 reorganization plan. WHBA moves for reversal of the Confirmation Order. For the reasons discussed below, the Confirmation Order is AFFIRMED.

### I. Background

The Debtor, a limited partnership comprised of seven limited partners and one general partner, Stanley E. Cox, is the owner of real property consisting of a Ramada Inn hotel, adjacent restaurant and approximately eight acres of vacant land, all of which is secured by two mortgages in favor of WHBA in the amount of $3.3 million. On January 27, 1994, Debtor entered into a five-year lease agreement with API of Indiana, Inc. ("API") for the hotel portion of the premises, whereby API would pay Debtor a variable amount of rent dependent upon the revenues generated by the hotel. The lease further provided API with an option to renew every five years for a twenty-five year period, and was later amended to provide API with various purchase options as well. Following Debtor's default in payment of its mortgage obligations and WHBA's subsequent commencement of foreclosure proceedings, Debtor filed a petition for reorganization on February 16, 1995 under Chapter 11 of the Bankruptcy Code, 28 U.S.C. § 1101, *et seq.* (1988) (the "Code").

Pursuant to various factual determinations and over the rigorous objection of WHBA, the principal creditor, the Bankruptcy Court entered an order confirming the Debtor's First Amended Plan (the "Plan") on July 31, 1996. As a predicate to passage of the Plan, the Bankruptcy Court calculated the value of Debtor's property to be $2.4 million, thus giving WHBA a $2.4 million secured claim and a $900,000 unsecured deficiency claim against the Debtor. The Plan provided the Debtor with the following obligations: (i) a balloon payment of the principal of WHBA's $2.43 million secured claim in seven years, with interest payments at a rate of 8% due over the seven year period; (ii) payment of *pro rata* shares of $65,000 to all unsecured claimants, the largest of which is WHBA, in each of the seven years following confirmation; (iii) present payment of administrative fees, priority claims, and convenience creditors; (iv) payment of priority tax claims plus interest over a six-year period; and (v) execution of a new lease agreement between Debtor and API for seven years, increasing API's rental payments from their pre-petition levels. The Plan also called for Debtor to lease to API both the hotel and the restaurant, whereas only the hotel had been leased previously. There are sixteen issues raised on appeal relating to valuation, allowance of claims, the extent of WHBA's lien on cash collateral and other procedural matters. The central claim raised on this appeal, however, relates to whether it was permissible for the Debtor to classify API separately from other unsecured creditors, thus allowing the Debtor to utilize the "cramdown" provision of the Code to secure confirmation of its plan.

### II. Discussion

The applicable standard of review for bankruptcy appeals is set forth in Bankruptcy Rule 8013, which provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge credibility of the witnesses." Fed. R.Bankr.P. 8013. A finding of clear error is appropriate when "although there is evidence

---

**1.** Alan Glantz, a third year student at Fordham Law School, assisted in the research and preparation of this decision.

to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Metzen v. U.S.,* 19 F.3d 795, 797 (2d Cir.1994) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). To the contrary, a bankruptcy court's conclusions of law are subject to *de novo* review by the district court. *See In re Maxwell Newspapers, Inc.,* 981 F.2d 85, 89 (2d Cir.1992).

### A. Improper Classification of Claims

■ In order for a reorganization plan to be approved, it must either (i) obtain the acceptance of all classes of creditors affected thereby, 11 U.S.C. § 1129(a)(8), or (ii) in the absence of such unanimous approval, secure acceptance by at least one class of impaired creditors, § 1129(b). WHBA contends that the Bankruptcy Court's allowance of the Debtor to classify API apart from all other unsecured creditors constitutes reversible error. According to WHBA, API's claim does not contain any unique qualities that would merit separate classification, and thus such classification serves merely as an improper vehicle to create an accepting class of creditors in order for the "cramdown" plan to be approved.

■ The classification of claims is governed by 11 U.S.C. § 1122, which provides that "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Although this provision explicitly prohibits the placement of dissimilar claims in the same class, it does not address the issue of whether similar claims must be placed in the same class. The Second Circuit has addressed this concern and held that while it is impermissible for a debtor to form a separate class of unsecured creditors for the sole purpose of obtaining an assenting class of impaired creditors, such separate classification will be allowed where the debtor can provide "credible proof of a legitimate reason for separate classification of similar claims." *In re Boston Post Road Ltd. Partnership,* 21 F.3d 477, 483 (2d Cir.1994).

A careful review of the bankruptcy court's record indicates that the judge applied the proper legal standard in finding the debtor's classification scheme permissible. Accordingly, this Court may reverse the bankruptcy court only upon concluding that its factual findings were clearly erroneous. The bankruptcy court found that reasonable grounds existed for placing API's unsecured claim into its own class given API's significant noncreditor interests relating to the Debtor's reorganization and API's continuous funding obligations under the Plan. Under the terms of API's lease agreement, API provides the Debtor with the funding necessary to fulfill its payment responsibilities to its creditors by either: (1) making the required periodic rental payments to the Debtor; (2) exercising its option to purchase the property; or (3) choosing not to exercise its purchase or lease renewal options, whereby the creditors are left with a hotel, including the improvements added to it by API, unencumbered by the lease. As the bankruptcy court aptly noted, the facts of this case are analogous to those in *Heartland Federal Savings & Loan Ass'n v. Briscoe Enterprises, Ltd. II,* 994 F.2d 1160 (5th Cir.1993), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993) [hereinafter *"Briscoe"*].

In *Briscoe,* the Fifth Circuit held that it was proper for the bankruptcy court to permit the debtor, the owner of a low-income housing project, to separately classify the city of Fort Worth from other unsecured creditors since the city had significant "noncreditor" interests in its urban housing program and contributed monthly payments to the Debtor's property as rental assistance. *Id.* at 1167. Here, separate classification occurred given API's continuous funding obligations under the Plan and API's interest in maintaining its leasehold on the property. As in *Briscoe,* I conclude that the bankruptcy court's approval of the Debtor's classification scheme in the approved Plan was not clearly erroneous, particularly when considering the strong discretionary power that bankruptcy judges possess in classifying claims under § 1122(a). *See Steelcase Inc. v. Johnston,* 21 F.3d 323, 327 (9th Cir.1994).

■ In conjunction with its objection to the Debtor's classification of claim holders,

WHBA also argues that the Plan violates the "absolute priority rule," which provides that for a plan to be fair and equitable, "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). The Court need not address the issue of whether the Debtor's retention of its equity interests and the Plan's provisions for payment to insider creditors absent the Debtor's satisfaction of its financial obligations to the other creditors violates the absolute priority rule. This rule is applicable only where a senior class of creditors votes against a plan and a junior class receives or retains property under the plan. *See In re City of Col. Springs Spring Creek Gen. Improvement District,* 187 B.R. 683, 690 (Bankr.D.Colo.1995) (absolute priority rule not applicable where all classes of unsecured creditors voted in favor of the plan, even if certain members dissented). Despite WHBA's contention to the contrary, insider votes are permissible in tabulating class consent to a plan, as long as there exists at least one other impaired class of creditors, not including the votes of insiders, who approve the plan. *See In re Gilbert,* 104 B.R. 206, 213 (Bankr.W.D.Mo.1989) (§ 1126(c) in no way prohibits insider votes in determining class approval); *In re Grimes Furniture, Inc.,* 47 B.R. 68, 70 (Bankr. W.D.Pa.1985) (same). Therefore, since API approved the Plan and the $3,013,053 of Affiliate Claims voting in favor of the Plan clearly outvotes WHBA's unsecured deficiency claim, the Plan was approved by both classes of general unsecured creditors. Accordingly, the absolute priority rule is not violated.

### B. Fair and Equitable Nature of the Plan

■ Under § 1129(b)(1) of the Code, if the debtor fulfills all of the requirements of § 1129(a) except for the provisions of § 1129(a)(8) (acceptance of the plan by all impaired classes), the bankruptcy court may still confirm the plan if it is fair and equitable.[2] In addition to challenging the bankruptcy court's method of valuing the collateral (the real property), and hence the court's determination of the amount of its secured claim, WHBA (as a class of dissenting secured creditors) argues that the Plan is not fair and equitable since the 8% interest payments over the seven-year period, plus payment of the principal, does not provide a present cash value equal to the allowed amount of its secured claim as of the effective date of the Plan.

During the confirmation hearing, both the Debtor and WHBA presented expert testimony on the appropriate method for valuating the Property. The Debtor's expert witness argued that the discounted cash flow method, which takes into account the API lease on the value of the premises, was the most appropriate technique. On the other hand, WHBA's expert concluded that the Property should be appraised without this encumbrance. After listening to the testimony adduced from both of these experts, Bankruptcy Judge Lifland made a factual determination that the opinion given by the Debtor's expert was the most credible. Confirmation Order at p. 36. Using the discounted cash flow method, the court determined the value of the hotel, restaurant and vacant land to be approximately $2.43 million, thus giving WHBA a secured claim against the Debtor in this amount and an unsecured deficiency claim of approximately $900,000.[3] *See* 11 U.S.C. § 506(a) (allowed claim is secured to the extent of the "value of [the] creditor's interest" in the estate's property, and is unsecured to the extent that the value of the creditor's interest is less than the amount of the allowed claim).

Similarly, the bankruptcy court found that the testimony rendered by the Debtor's expert was more credible on the issue of the appropriate interest rate to be applied to the secured claim, such that WHBA would re-

**2.** A plan is considered to be fair and equitable with respect to a class of secured creditors if the plan allows such secured creditors to retain their liens on the Debtor's property and each secured claim holder receives deferred cash payments equaling the amount of its allowed secured claim

as determined as of the effective date of the plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i).

**3.** WHBA had two mortgages on the hotel, restaurant and vacant land in the amount of $3.3 million.

ceive the present value of its secured claim. Based on the expert testimony, the bankruptcy court found that the market rate of interest for a $2.43 million loan secured by the combination of the hotel, restaurant, vacant land, improvements added to the premises by API and API lease is 8%. Since both parties' experts presented an accepted method of property valuation and it is clearly within the province of the trial judge to assess the credibility of witnesses, the bankruptcy court's findings with respect to the value of the property and interest rate were not clearly erroneous.[4] *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (never clear error for a judge to find one witness' testimony more credible than another's when both offer plausible stories uncontradicted by extrinsic evidence); *see also* Fed. R. Bankr.P. 8013 ("[D]ue regard shall be given to the opportunity of the bankruptcy court to judge credibility of the witnesses.").

### C. Best Interest of the Creditors

■ WHBA contends that the Plan violates § 1129(a)(7)(A)(ii), which mandates that either each member of an impaired class or interest accept the plan or receive property, as of the effective date of the plan, that is not less than the amount it would receive if the debtor underwent a Chapter 7 liquidation. Specifically, WHBA argues that under a Chapter 7 liquidation, the trustee would have to abandon the premises, since the property could only be sold subject to API's lease and purchase options, and the value of the property would not be enough to cover WHBA's two mortgages. Consequently, WHBA would foreclose on its mortgages and receive either the property or its value under a foreclosure sale, which is greater than the amount WHBA will receive under the Plan.

I find that the bankruptcy court's determination that creditors would receive at least as much under the Plan as they would in a Chapter 7 liquidation is not clearly erroneous. Under the Plan, WHBA will receive $2.43 million for its secured claim, which is the value of the hotel, restaurant, and vacant land encumbered by the API lease, as well as payments for its unsecured claim. If, however, the Debtor liquidated under Chapter 7, WHBA would receive nothing for its unsecured claim and either receive the property still encumbered by the API lease, *see* 11 U.S.C. § 365(h), having a value of $2.43 million ($2.15 million of which is the value of the hotel), or API would terminate its lease and remove its fixtures and improvements, decreasing the fair market value of the hotel to $1.4 million. The possibility of WHBA being able to commence foreclosure proceedings in the future and extinguish the API lease is immaterial to an inquiry under § 1129(a)(7), since the best interest of the creditors test only assesses the effective date of the plan. *See In re 203 North LaSalle Street Limited Partnership,* 190 B.R. 567, 584 (Bankr. N.D.Ill.1995) ("Section 1129(a)(7) directs that value be determined as if the debtor were 'liquidated' on the effective date of the plan."), *aff'd,* 126 F.3d 955 (7th Cir.1997).

### D. Feasibility

■ Contrary to the findings of the bankruptcy court, WHBA argues that confirmation of the Debtor's Plan is likely to be followed by liquidation of the Debtor, and hence violates § 1129(a)(11).[5] According to WHBA, the Plan provides for the granting of a new lease and purchase option which is in direct opposition to the express terms of WHBA's mortgages, thus giving WHBA proper cause to foreclose. Nevertheless, despite WHBA's contentions, the bankruptcy court's findings in this regard were not clearly erroneous. Under the Plan and the new API lease and purchase option, the total amount owed to WHBA pursuant to its mortgages are accounted for, thus making the

---

4. While the opinion testimony of Mr. Cox regarding the value of the property should not have been admissible, since he was not qualified as an expert valuation witness, Fed.R.Evidence 702, this was harmless error because sufficient evidence exists from Debtor's expert to support the bankruptcy court's conclusion. On the other hand, the testimony provided by WHBA's witness on the internal value assigned to the loan being

purchased by WHBA was factual, as opposed to opinion testimony, and is therefore admissible.

5. Section 1129(a)(11) prohibits a court from confirming a plan that is likely to result in subsequent liquidation or reorganization, unless such liquidation or reorganization is provided for in the plan.

likelihood of foreclosure and liquidation remote. In addition, the new lease agreement does not impair WHBA's pre-petition position, since the appellant will retain its two mortgages under the Plan through retention of a lien on the Debtor's assets and receipt of deferred cash payments totaling the amount of its secured claim. Furthermore, WHBA provides no support for the contention that it will be able to foreclose on its mortgages, especially in light of the fact that it has been unable to do so up until this point.

## E. Bad Faith

■ In order for a reorganization plan to be approved, § 1129(a)(3) of the Code requires that the plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). WHBA argues that the Debtor's Plan violates this mandate, since the primary motivation in proposing the Plan was to avoid a foreclosure or sale of the property which would result in a substantial tax liability for investors. Even if the Court were to accept WHBA's contention as true, a debtor's desire to avoid adverse tax consequences alone is insufficient to establish bad faith. See In re 203 North LaSalle Street Partnership, 126 F.3d 955, 969 (7th Cir.1997), cert. granted, —— U.S. ——, 118 S.Ct. 1674, 140 L.Ed.2d 812 (1998) (avoidance of tax liability "in and of itself, is insufficient to establish that the bankruptcy court clearly erred because the desire to avoid serious tax liabilities, if legal, is a result consistent with the Bankruptcy Code"). Moreover, sufficient evidence exists to support the bankruptcy court's finding that the Plan was proposed with good intentions and with a reasonable expectation of effecting reorganization. The Debtor was in need of reorganization to maintain its business and keep its franchise, and the Plan, including the modified API lease, allowed the Debtor to make payments to creditors and preserve the potential equity in the property for investors.

## F. Cash Collateral of the Restaurant

■ WHBA argues that the Debtor's restaurant is operated by the Boulevard Hotel Company ("Boulevard") as a lessee and that its revenues paid to the Debtor are therefore rent, thus entitling WHBA to the restaurant's net revenues, in addition to the API rental payments, as cash collateral. In support of its submission that the Boulevard is the de facto tenant of the restaurant, WHBA introduced a sworn affidavit by Jeffrey B. Katz, filed with the Bankruptcy Court after the confirmation hearing and not included in the Designation of Record, stating that the Boulevard is the holder of the hotel retailer's permit issued by the Indiana Alcoholic Beverage Commission ("IABC") and that various records on file with the IABC list the Boulevard as a lessee of the restaurant. The Debtor, however, denies the existence of any lease between the Boulevard and itself, and argues that only it operates the restaurant. Based on the testimony of Stanley Cox, the Debtor's general partner, the bankruptcy court found that no lease agreement existed.

Again, the status of the Boulevard is a factual issue and as such requires that this Court examine the bankruptcy court's finding for clear error. The Katz Affidavit is not included in the Bankruptcy Court Record and thus cannot be considered on this appeal. See, e.g., In re Prudential Lines, Inc., 1994 WL 142017, *2 (S.D.N.Y. Apr. 20, 1994) ("The record on appeal should contain all documents and evidence bearing on the proceedings below and considered by the bankruptcy judge in reaching his decision.") (quoting In re W.T. Grant Co., 432 F.Supp. 105, 106 (S.D.N.Y.1977)). Moreover, it would be prejudicial to consider the Katz Affidavit in this appeal since the Debtor lacked the opportunity to cross-examine him or adduce evidence from other witnesses regarding the documents referred to in the affidavit. Understanding such, I hold that based on the evidence produced at the confirmation hearing, the bankruptcy court's determination regarding the relationship between the Debtor and the Boulevard is not clearly erroneous.

## G. Adequate Protection of Cash Collateral

WHBA contests the bankruptcy court's order granting the Debtor's request to use cash collateral for purposes of funding the administrative expenses in this case. Such administrative expenses include approximately $286,000 in attorneys fees and expenses and

about $3,000 in accounting fees for services rendered by such professionals in representing the Debtor in the bankruptcy proceedings. In support of its application to the bankruptcy court, the Debtor argued that WHBA's cash collateral claim, estimated to be about $134,000, would be adequately protected by the terms of the Plan which provide WHBA with a security interest in the following: (1) $600,000 of excess proceeds of a loan which may be made by API seven years hence in the sum of $2.9 million; (2) $600,000 of proceeds from the sale of the property seven years hence which may be generated by the exercise of API's option to purchase the property for $2.9 million; or (3) the fair market value of the property seven years hence.

■ The Debtor is required to provide adequate protection in order to use WHBA's cash collateral to fund its administrative expenses. *See In re 680 Fifth Ave. Associates,* 154 B.R. 38, 43 (Bankr.S.D.N.Y.1993); *In the Matter of M4 Enterprises, Inc.,* 183 B.R. 981, 984–85 (Bankr.N.D.Ga.1995); *In re Dynaco Corp.,* 162 B.R. 389, 393 (Bankr.D.N.H.1993). There exists ample evidence in the record to support the bankruptcy court's conclusion that the Debtor satisfied this requirement. Under the terms of the Plan, which provide API with the option of either purchasing the property or making a loan to the Debtor in the amount of $2.9 million, the $600,000 of excess proceeds sufficiently protects WHBA's interest in the cash collateral. In addition, the fair market value of the property without the API lease and purchase option in seven years is approximately $3.3 million, which also provides WHBA with a sufficient equity cushion to support its secured and cash collateral claims.

### H. API's Claim

■ Another point of dispute among the parties is whether the bankruptcy court properly concluded that API holds both liquidated and unliquidated unsecured claims. According to WHBA, API, as a lessee and holder of a purchase option, could only have an allowable claim if its rights under the lease or purchase option were somehow impaired. Nevertheless, the bankruptcy court found that API held contingent and fixed unsecured claims stemming from legal fees and expenses spent in connection with the bankruptcy proceedings and the foreclosure action commenced by WHBA, as well as from the Debtor's pre-petition mortgage default which constituted a default under their lease agreement. The bankruptcy court's findings in this regard were not clearly erroneous since such claims are deemed allowed under § 502 of the Code. The result of WHBA's commencement of foreclosure proceedings, which entails the potential effect of terminating API's possessory interest in the property, creates a contingent claim for API. In addition, the evidence presented by WHBA is insufficient to show that the bankruptcy court clearly erred in finding that API suffered approximately $100,000 in damages on account of the Debtor's default under the API lease.

### I. Affiliated Claims

Finally, WHBA objects to the bankruptcy court's allowance of $3 million of insider claims, filed by Horizon Hotels Ltd. ("Horizon") and Mr. Cox, and argues that such claims should be recharacterized as capital contributions, equitably subordinated to the claims of the other unsecured creditors [6] or alternatively barred by the statute of limitations. Nevertheless, given the evidence presented at the confirmation hearing and an examination of the bankruptcy court's factual findings for clear error, no legal basis exists to equitably subordinate the insider claims or disallow them under the statute of limitations.

■ When an insider's claim against a Debtor is found to be for the return of a capital contribution and not for repayment of a loan, such insider's claim must be equitably subordinated to the claims of other unsecured creditors since capital funds are used to cover the obligations of the debtor and may not be repaid until all other classes of

---

**6.** Section 510(c) of the Bankruptcy Code provides for the subordination of claims that are otherwise allowable when equity principles would be offended by allowing such claims to be on par with those of other creditors. 11 U.S.C. § 510(c).

454

debt have been satisfied. *In re Interstate Cigar Company, Inc.,* 182 B.R. 675, 678 (Bankr.E.D.N.Y.1995). While a significant test for determining whether a claim is a capital contribution is if a disinterested lender would have made such loans at the same time, courts may consider several other factors, including an inquiry into the sufficiency of the capitalization, the name given to the debt instruments, the source of payments and whether payment of interest comes from corporate allocations for dividends. *Id.* at 680; *see also Summit Coffee Company v. Herby's Foods, Inc.,* 2 F.3d 128, 132 (5th Cir.1993). However, since there is an incentive and opportunity to take advantage, dominant shareholders' and other insiders' loans in a bankruptcy must be subject to rigorous scrutiny. *In re Mid–Town Produce Terminal, Inc.,* 599 F.2d 389, 392 (10th Cir.1979); *Pepper v. Litton,* 308 U.S. 295, 306–07, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

■ In addition, courts have generally held that some sort of inequitable conduct is required to subordinate insider claims to the claims of other creditors. *In re Mid–Town Produce Terminal, Inc.,* 599 F.2d at 392. Inequitable conduct includes: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego. *In re Herby's Foods, Inc.,* 2 F.3d at 131; *Matter of Fabricators, Inc.,* 926 F.2d 1458, 1467 (5th Cir.1991). In order to merit subordination, the inequitable conduct must result in injury to the creditor seeking subordination and equitable subordination of the claim must not be inconsistent with the provisions of the Code. *In re Castillo,* 7 B.R. 135 (Bankr.S.D.N.Y.1980).

■ Based on the evidence presented at trial, there is no basis to recharacterize the affiliate loans as capital contributions, and nothing in the record suggests inequitable conduct on the part of Cox or Horizon. The bankruptcy court found that the Debtor was adequately capitalized at its inception, operated profitably for over seven years and made distributions to partners prior to requiring loans in 1985. No evidence shows that these findings are clearly erroneous. In addition, Judge Lifland determined that all of the indicia of arms-length loans were present, including the fact that the loans were evidenced by demand notes specifying payment of interest, partial payments on the loans were made, and Cox's testimony which stated his expectation of being repaid from the proceeds of the sale of the property. These findings are likewise not clearly erroneous based on the evidence. Finally, none of the evidence presented shows that Cox or Horizon engaged in any wrongdoing or inequitable conduct or that WHBA was prejudiced by the affiliate loans.

■ Lastly, the Affiliate Claims in the Plan are not time-barred. WHBA argues that because some of the funds under the affiliate loans were advanced more than ten years ago the statute of limitations bars collection of such claims. However, the Debtor's partial repayment of these claims in 1992 through 1994 revived the statute. *See Security Bank of New York v. Finkelstein,* 160 A.D. 315, 145 N.Y.S. 5, 9 (1st Dept.1913), *aff'd,* 217 N.Y. 707, 112 N.E. 1076 (1916) (payment of the principal or interest gives rise to an implied promise, in the absence of evidence to the contrary, to pay the balance of the indebtedness and the statute of limitations restarts from that time); *see generally,* 12 Am.Jur.2d § 1061. Furthermore, the Debtor's continued inclusion of the affiliate loans and accounts payable to Cox and Horizon on the Debtor's annual financial statements, books, and records also supports the bankruptcy court's finding that the statute of limitations was tolled. *See In re Meyrowitz' Estate,* 114 N.Y.S.2d 541, 546 (N.Y.Sur.1952), *aff'd,* 284 A.D. 801, 132 N.Y.S.2d 327 (1st Dept.1954) (written acknowledgment of the debt that contained nothing inconsistent with an intent to satisfy the obligation may also restart the statute of limitations).

### III. Conclusion

For the reasons stated above, the Confirmation Order is AFFIRMED. The clerk is instructed to close this case.

**SO ORDERED.**